UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHRIS WHITE                                                                                          PLAINTIFF

v.                                        No. 2:17-CV-02207

JON MARK SIMPSON, individually
and in his official capacity as Mayor, et al.                                                   DEFENDANTS

**OPINION AND ORDER**

Before the Court is Defendants' motion (Doc. 26) for summary judgment. Defendants filed a brief (Doc. 27) and statement of facts (Doc. 28) in support. Plaintiff Chris White ("White") filed a response (Doc. 31) and brief (Doc. 32) in opposition. Contrary to Local Rule 56.1(b), White did not file a separate response to Defendants' statement of facts. Defendants filed a reply. (Doc. 33). The parties filed a joint motion (Doc. 42) to continue the trial. White alleges Defendants have violated his federal and state constitutional rights in a manner actionable under Title III of the Civil Rights Act of 1964, 42 U.S.C. § 1983, and the Arkansas Civil Rights Act of 1993. For the reasons set forth below, Defendants' motion for summary judgment will be granted.

**I.     Background**

The Marvin Vinson Multi-Purpose Building is a recreational building open to the City of Clarksville community. It is owned by the City of Clarksville and operated by the city council and the Parks and Recreation Advisory Board. Community members may swim at the Marvin Vinson Building's Aquatic Center. The Aquatic Center relies on various safety measures to ensure patron safety and satisfaction, such as employing lifeguards to monitor those using the pool. Additionally, the Aquatic Center has a list of sixteen rules and regulations that must be followed. (Doc. 28-6). Rule number ten provides "[n]o obscene language, crude or inappropriate behavior will be tolerated." (Doc. 28-6).

1

Whitney Barnes works as a lifeguard at the Aquatic Center. White and Ms. Barnes presumably met at the Aquatic Center while White would swim, and the two would talk often. Each would initiate conversation with the other. (Doc. 32-1, p. 2). Ms. Barnes regularly spoke with White and did not always tell him that he was bothering her. (Doc. 28-7, p. 5). Although some of their conversations made her feel uncomfortable, Ms. Barnes "didn't feel it was necessarily inappropriate at the time." (Doc. 32-1, p. 5). Ms. Barnes testified that she and White would openly discuss her religious beliefs. (Doc. 32-1, p. 8). Ms. Barnes never told anybody prior to December 2016 that she and White were having religious-based conversations.

White and Barnes spoke nearly every day that White was at the Aquatic Center, which eventually became most days Ms. Barnes worked. During the fall of 2016, Ms. Barnes's work schedule was rearranged so that she worked in the morning rather than in the afternoon. (Doc. 28-7, p. 3). White, who previously swam at the Aquatic Center in the afternoon, altered his schedule to swim in the mornings. (Doc. 28-7, p. 3; Doc. 28-2, p. 3; Doc. 28-5, p. 4). Both continued to communicate with each other regularly. Their conversations eventually became lengthy enough to distract Ms. Barnes from her duties as a lifeguard. (Doc. 28-2, p. 2). During one conversation, Mary Townsend, the Director of the Aquatic Center, observed Ms. Barnes speaking to White with her back to the pool for five minutes. (Doc. 28-8, p. 2).

Ms. Townsend met with both White and Ms. Barnes to discuss the distractions caused by their conversations. Ms. Townsend documented in her journal that she discussed the issue with Ms. Barnes on December 2, 2016. (Doc. 28-8, p.1). White "was never notified that his failure to 'stop distracting the life guards' could result in a complete ban from the Marvin Vinson Multi-Purpose Building . . . ." (Doc. 32, p. 18). However, White testified that Ms. Townsend indeed spoke to him about distracting the lifeguards, stating, "Mary told me later that when I talked to the

2

lifeguards that I need to make sure and not stand in front of them and make sure I don't block their vision of the pool." (Doc. 28-5, p. 7). Ms. Townsend agrees, and claims that she told White to "stop distracting the lifeguards." (Doc. 32-3, pp. 2-3). Despite these warnings, however, Ms. Townsend observed White on surveillance video engaging in the same distracting behavior while she was not at the Aquatic Center. Concerned for the safety of those using the pool, she decided action was necessary. She contacted Tom Cogan, the Parks and Recreation Director for the City of Clarksville, at the beginning of December 2016 and the two decided to seek the assistance of the Mayor, Jon Simpson, in handling the problem. (Doc. 32-3, pp. 2-3).

In December 2016, Mayor Simpson, Mr. Cogan, and Chief Weathers met with Ms. Barnes. (Doc. 32-4, p. 3). During their discussion, Ms. Barnes disclosed that, in addition to distracting her while she was on duty, White regularly engaged in inappropriate behavior. (Doc. 32-4, p. 3). This was the first time she discussed White's behavior with anybody. (Doc. 28-1, p. 3). She identified two other females, Christal Brooke and Emilie Rohr, with similar stories. Ms. Barnes stated that White sexually harassed her, Ms. Brooke, and Ms. Rohr on different occasions. Mayor Simpson, Mr. Cogan, and Chief Weathers decided it was necessary to ban White from the Marvin Vinson Building, but chose to wait for Ms. Townsend to provide a statement before memorializing the decision. (Doc. 28-1, p. 3).

On December 16, 2016, prior to Defendants banning him from the premises, White delivered a boxed Christmas gift to Ms. Barnes at the Marvin Vinson Building. Ms. Barnes immediately notified Ms. Townsend but did not open the box. Ms. Townsend then notified Mr. Cogan. (Doc. 28-2, p. 4). White testified that the gift contained "Skittles and one of those vacuum insulated cups" with a card that read, "Merry Christmas, Whitney, Jesus loves you. Chris." (Doc. 28-5, p. 13). No Defendant opened the box. Mr. Cogan, Mayor Simpson, and Chief

3

Weathers decided it was necessary to immediately ban Mr. White from the Marvin Vinson Building. (Doc. 28, ¶ 76). That same day, Officer Jeff Ross provided White with written notice that he was banned from the Marvin Vinson Building for violating policy and procedures. (Doc. 32-13; Doc. 28-1). Specifically, Defendants identify pool rule number ten as the basis for the ban. (Doc. 28-15, p. 2).

On February 16, 2017, written statements were obtained from Ms. Brooke and Ms. Rohr corroborating the information provided by Ms. Barnes. (Doc. 32-10; Doc. 32-11). Ms. Brooke detailed the various times White engaged in inappropriate behavior, including statements that he "lusts" after her and other female lifeguards. (Doc. 32-10). Ms. Rohr identified a conversation in which White described a wrestling move that "was a good way to control a woman from behind." (Doc. 32-11).

In August of 2017, the City of Clarksville's Parks and Recreation Board held a hearing to discuss White's ban from the Marvin Vinson Building. (Doc. 28, p. 16). White chose not to testify at the hearing, but Kevin Holmes, White's attorney, addressed the Board on White's behalf. (Doc. 28-14). The Board ultimately upheld White's ban.

On November 6, 2017, White filed the instant action against Mayor Simpson, The City of Clarksville, Jeff Ross, Tom Cogan, and Mary Townsend alleging the defendants violated his constitutional rights including his right to freedom of religion, speech, association, and due process. On August 16, 2018, Defendants moved for summary judgment on all counts. In their motion for summary judgment, Defendants argue that the City of Clarksville and its representatives were justified in banning White from the Marvin Vinson Building because White created a safety risk by repeatedly distracting on-duty lifeguards. Defendants argue that the decision was further justified because White repeatedly sexually harassed female employees of the

Marvin Vinson Building. Finally, Defendants contend that White received constitutionally sufficient process throughout the procedure leading to the City's decision to ban him.

## II. Legal Standard

When a party moves for summary judgment, it must establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606-07 (8th Cir. 1999). In order for there to be a genuine issue of material fact, the nonmoving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only facts "that might affect the outcome of the suit under the governing law" need be considered. *Anderson*, 477 U.S. at 248. Indeed, "a fact is material if its resolution affects the outcome of the case." *Rakes v. Life Inv'rs Ins. Co. of Am.*, 582 F.3d 886, 893 (8th Cir. 2009). "[T]he non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof." *P.H. v. Sch. Dist. of Kan. City, Mo.*, 265 F.3d 653, 658 (8th Cir. 2001) (quotation omitted). Facts asserted by the nonmoving party "must be properly supported by the record," in which case those "facts and the inferences to be drawn from them [are viewed] in the light most favorable to the nonmoving party." *Id*. at 657.

## III. Analysis

White alleges that Defendants violated his constitutional rights to freedom of religion, speech, association, and due process. White identifies various inconsistencies and contradictory statements and argues that this gives rise to a genuine dispute of material fact. He argues there are discrepancies regarding the date of the decision to implement the ban, the dates Ms. Townsend

was out of town, and the number of times Ms. Barnes made reports to University of the Ozark's security. Even if these inconsistencies were supported by citation to the record, any dispute is not material. For summary judgment purposes, a dispute must be about a fact that "affects the outcome of the case." *See Rakes*, 582 F.3d 893. White fails to demonstrate these inconsistencies relate to a fact that affect the outcome of the case.

### A. Free Exercise and Freedom of Speech Claims

White argues that Defendants deprived him of his constitutionally protected rights to freedom of religion[1] and freedom of speech. To succeed on a free exercise claim, White must show that Defendants engaged in some type of discriminatory practice targeting his religious beliefs. *See Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."). To succeed on his free speech claim, White must show that Defendants banned him on account of the content or viewpoint contained in his speech, and not because of his conduct. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."); *id.* at 389-90 (explaining there is no First Amendment violation when a conduct regulation is violated by means of speech).

White argues that he was banned from the Marvin Vinson Building because of his religion. White testified that he believes Defendants banned him because they hated Jesus. (Doc. 28-5, pp. 10, 12). He argues that by depriving him of his right to discuss his religious views at the

---

[1] As Defendants point out, it is difficult to identify the underlying basis for White's freedom of religion claim. (Doc. 27, p. 3). In his brief, White appears to rely on the Free Exercise Clause. (Doc. 32, p. 19 ("Not all burdens upon religion violate the free exercise clause.")).

6

Marvin Vinson Building, Defendant impermissibly infringes on his freedom of speech. Both claims depend on White providing facts from which a reasonable juror could infer that White was banned because of his religion or the content or viewpoint of his speech, rather than because of his conduct. Considering the undisputed facts in a light most favorable to White, he fails to meet his burden of production.

With respect to his free exercise claim, White provides no evidence that any Defendant knew of his religious discussions with Ms. Barnes. White provides no evidence that any party knew of the "Jesus loves you" message within the gift to Ms. Barnes. Rather, when asked what evidence he could offer that Defendants' decision was motivated by White's exercise of his religious beliefs, White replied:

> We're told in the Bible the standards to judge that by, and we're going through that process now. The Standard we're told by Jesus himself is the word he uses is blameless, make sure you are blameless, so when they come after you, they know it will be because of Me.
> And that one of the reasons this is important, because I am blameless, and these little uncorroborated statements are their attempt to make me to be blamed. I know those things aren't true, so I know I'm blameless in this situation, and therefore Jesus only allows for one other thing that can be now that I'm blameless is that they're coming after me because they're coming after Him. And that's consistent throughout the whole New Testament.

(Doc. 28-5, p. 12). This evidence, according to White, is "all I need." (Doc. 28-5, p. 12).

With respect to his freedom of speech claim, the evidence shows that White was banned because he was distracting on-duty lifeguards, and because he was sexually harassing them. Mary Townsend testified that she told White that he needed to stop distracting the lifeguards. (Doc. 28-2, p. 2, ¶ 5). White testified that Ms. Townsend did speak to him about distracting the lifeguards: "Mary told me later that when I talked to the lifeguards that I need to make sure and not stand in front of them and make sure I don't block their vision of the pool." (Doc. 28-5, p. 7). Thereafter, White continued to engage lifeguards in conversation and direct their attention away

7

from swimmers in the pool. Ms. Townsend then decided further action was necessary. Mayor Simpson, Chief Weathers, and Mr. Cogan met with Whitney Barnes to discuss the problems with White. During this meeting, they discovered that White had made sexually explicit comments to Ms. Barnes and other female employees. Defendants then decided to ban White from the Marvin Vinson Building. That White used speech (rather than, for example, physical contact) as the means by which he distracted on-duty lifeguards and sexually harassed them does not give rise to a free speech claim.

White's evidence is insufficient to overcome summary judgment on any free exercise or free speech claim, and Defendants' motion for summary judgment will be granted regarding these claims.

B. **Freedom of Association**

White argues that his ban from the Marvin Vinson Building infringes on his freedom of association. When assessing a freedom of association claim the Court must determine (1) whether White has identified an associational right that has been significantly burdened by Defendants; and (2) if White's association right has been significantly burdened, whether Defendants' action was justified by a compelling interest. *Royer ex rel. Estate of Royer v. City of Oak Grove*, 374 F.3d 685, 687-88 (8th Cir. 2004) (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 (2000)). There are two broad classifications of associational rights: (1) "the right to enter into and maintain certain intimate human relationships;" and (2) "the right to associate for the purpose of engaging in those activities protected by the First Amendment . . . ." *Id.* at 688 (internal quotations omitted) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).

The Court assumes without deciding that White has a protected associational right in the activities that can occur at the Marvin Vinson Building. *Accord Royer*, 374 F.3d at 688 (assuming

8

without deciding that a plaintiff had a protected associational right to meet at a community center). The Court must next determine whether White's ban from that building is a significant burden on his associational rights—and if so, whether there is a compelling interest that justifies the ban. *Id.* at 687 (citing *Dale*, 530 U.S. at 648).

White claims that Defendants stripped him of "the most fundamental right in our democracy—the right to vote." (Doc. 32, p. 18). He further alleges that Defendants deprived him of his ability to obtain to a flu shot. White remains free to vote at the Johnson County Courthouse (Doc. 28-3, pp. 1-2), and he can receive a flu shot free of charge at many Johnson County Health Department locations, including the one at 6 Professional Drive in Clarksville. (Doc. 28-4, p. 1). White is free to engage in other activities protected by the First Amendment at any appropriate place other than the premises of the Marvin Vinson Building. Any burden on White's right to associate created by denying him access to the Marvin Vinson Building is not significant.

Even if the burden were significant, Defendants banned White because he distracted on-duty lifeguards and sexually harassed three female employees. Defendants have a compelling interest in protecting the safety of community members. Defendants must also protect City employees and take seriously their sexual harassment complaints. *Royer*, 374 F.3d at 688, n.5. White's complete ban from the Marvin Vinson Building is narrowly tailored to serve this interest. While the complete ban from the Marvin Vinson Building is more expansive than the ban in *Royer*, which was only in effect during the employee-victim's working hours, White previously changed his own hours of Aquatic Center use to ensure he could continue to engage Ms. Barnes, and his sexual harassment was not limited solely to her. Defendants' motion for summary judgment on the freedom of association claim will be granted.

### C. Due Process

Finally, White contends that Defendants violated his procedural due process rights because he "was never notified that his failure to 'stop distracting the life guards' could result in a complete ban from the Marvin Vinson Multi-Purpose Building . . . ." (Doc. 32, p. 18). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972). White has no property interest in unlimited access to a public building. *Royer*, 374 F.3d at 689. Furthermore, the liberty interests he identifies do not appear to be those fundamental liberty interests for which the protections of due process are required. *Id.*

White seems to rest his due process argument on his inability to vote at the Center. Although voting is a right fundamental to our democratic society, not every rule or law that implicates an individual's voting right is per se unconstitutional. *See Burdick v. Takushi*, 504 U.S. 428, 432-33 (1992) ("It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute."). While it is undisputed that White can no longer vote at the location of his choice, White may continue to cast his ballot at the Johnson County Courthouse. (Doc. 28-3). He has not been stripped of his fundamental right to vote. Similarly, to the extent any of the other activities White identifies implicate a fundamental liberty interest, he remains free to conduct those activities elsewhere. The protections of due process do not apply to the ban.

However, even assuming White was entitled to due process, he received all the process required by the Fourteenth Amendment. The Due Process Clause requires notice and a meaningful opportunity to be heard. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 399 U.S. 306, 313-14 (1950). White acknowledges that Ms. Townsend told him to stop distracting the lifeguards.

(Doc. 28-2, p. 2, ¶ 5). White received a letter notifying him that he was banned due to a violation of the Center's policies and procedures. (Doc. 32-13). Most importantly, the City's Parks and Recreation Board—a body that could have lifted the ban—held a hearing to allow White to present his case. White, on the advice of his counsel, Kevin Holmes, chose not to speak at the hearing, but Mr. Holmes spoke on White's behalf. White was afforded an opportunity to respond to the allegations resulting in his ban. Through Holmes, White argued he was merely expressing his religious beliefs. (Doc. 28-14). Assuming White was entitled to due process, he received the process he was due. Defendants' motion for summary judgment regarding White's due process claim will be granted.

### D. State Law Claims

Because the Court is dismissing the claims over which it has original jurisdiction, the claims over which the Court has supplemental jurisdiction will be dismissed without prejudice. 28 U.S.C. § 1367(c)(3); *Keating v. Neb. Pub. Power Dist.*, 660 F.3d 1014, 1018-19 (8th Cir. 2011).

## V. Conclusion

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 26) is GRANTED and Plaintiff's federal claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that the pending joint motion to continue the trial (Doc. 42) is DENIED as MOOT. Judgment will be entered accordingly.

IT IS SO ORDERED this 10th day of October, 2018.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE